We'll turn to the last case on the calendar today, Wheelings v. Dorosh. Mr. Williams, were you reserving any time today? Yes, if I could reserve three minutes, Your Honor. Go ahead. Thank you. Sean Williams for the sergeant and Mrs. Wheelings. The case before you has obviously several layers, each of which we contend that there was a Fourth Amendment violation. And the initial layer involves the entry. Rodriguez is certainly the controlling case, and Rodriguez makes it very clear that the mere possession of a key to the premises without more does not necessarily create apparent authority to consent to the warrantless entry. It's got to be fact-specific. In this particular case, there were absolutely no other factors that argued that the lady did have authority of any kind. And on the contrary, there were many… Didn't she say that it was her home? I'm sorry? Apart from the fact that she had a key. Anybody could have a key. Didn't she also say that this was her house? Well, she said it was her house. There was nothing at all, nothing at all other than the possession of the key that supported that. Is he supposed to have a notary there to take her statement under oath? No, I'm not suggesting that. She's there. She makes a representation. I want to go in there. My husband's there with another woman, and there could be a problem. And I have the key, and let's go. She's seeking her protection. No, she's not seeking protection. There's not a scintilla in this record to suggest that she's seeking protection. And that's one of the things that makes this different from Rodriguez. In Rodriguez, the lady did say that she was the victim of domestic violence, and she exhibited bruises that tended to corroborate that, plus the fact that she had the key here. There was nothing of that kind at all. She never suggested that there was any domestic violence going on. And, unlike in Rodriguez, in this instance, it was literally past the middle of the night, a dark night, a dark and silent house. The lady had no identification with her whatsoever. No driver's license, no anything to suggest that this was where she lived, or even that her name was what she claimed that it was. There was nothing. Well, she had the key. I mean, she says, this is where I live, and here's my key to go in. Right. And Rodriguez says that that's not necessarily enough, that you have to look at other factors. And when you look at all the other factors in this case, they all argue against authority. That's my point. There is nothing that would suggest to a reasonable officer, on that basis alone, in the early hours of the morning, a dark and silent house, it's okay to let this person who doesn't even produce identification walk in there and bring the police with her. Nothing whatsoever. So it seems to me that that's the starting point. But if you get past that, as soon as they were inside, the moment they're inside, the house continues to be dark and silent. One of the entering officers shouts out to Sergeant Wheelings, who's upstairs asleep. He appears at the head of the stairs, clad only in a bathroom, and he expresses shock. Myra, what are you doing here? And then proceeds to inform the entering police officers that this is, quote, a home invasion and tell them to leave. Now, that, of course. So we have a he said, she said situation. No, it's not a he said, she said in the sense that it is, even by her version, he was a resident of the premises. And therefore, he clearly had the power to revoke any consent that she did give, if it was a valid consent. He could revoke it. And that, of course, is Sir George Randolph. He could revoke it. He did revoke it. And they should have left instantly. The context of George Randolph is different from here. George Randolph was a search for contraband. This is not. This is an accompanying person into a house. There's no issue about criminality or investigating a crime or anything. It's closer to the protection cases. It seems to me that the Fourth Amendment is the Fourth Amendment. I don't believe that there's any case, I couldn't find any case, that would distinguish the facts of this case from the facts that are presented by George Randolph and his progeny. Well, in Georgia, they did say where the police enter over an objection in order to provide protection for a third party or to assess what protection may be required, quote, it would be silly to suggest that the police commit a tort by entering. But this was not such a case. There was no claim, even by this. But it wasn't a search case in the traditional sense that they're looking for evidence And, you know, the wife says, come on in. I want you to find my husband's cocaine. And the husband's saying, I don't agree to the search. This is a different kind of state. It's different in that sense. But on the other hand, there's no other circumstance that would warrant a distinction here. Okay. So he said, get out. They should have got out. But if you get past that, at a minimum, his statements created an ambiguity. So what happens at that point? If we've got that far, then the officers would have had some right to conduct some reasonable, and again, the word is reasonable, inquiry to clarify matters. But in this case, what they did was they confined Sergeant Wheelings to the kitchen, confined Mrs. Wheelings to a bedroom upstairs, and allowed this intruder to roam through the house shouting and swearing and abusing verbally the occupants of the house, damaging property, to the extent that the officer himself expressed concern that this woman needed to see a psychiatrist. So at that point, clearly, the evidence before them was such that they should have got out immediately. But instead, they maintained. How long were they in the house? I'm sorry? How long were they in the house? Forty-five minutes, which I submit is an exceedingly unreasonable period of time. And if you get past that, if you get past that then, you're at the point where they decide to leave. Are you going to par with that? I'm sorry? No, the fact, that's what you want them to do, right? Leave. But they left and left her behind, knowing that she was destroying property, knowing that she was threatening the safety of the occupants. In other words, committing crimes in their presence. Have we ever addressed that issue of the obligation of police officers to leave after, let's say we get past that first hurdle, after there's at least apparent authority to enter the premises or the home? Is there a case that you can cite to me, either from the Second Circuit or the Supreme Court? I don't have a case on all fours, but I suggest that it might be. Okay, if you don't have a case on all fours, then why aren't they at least entitled to qualified immunity on that point? Because I think it was Chief Judge Posner who once said, or maybe it was Judge Easterbrook, that merely because there isn't a case on point saying that child care workers can't sell their wards into slavery doesn't mean that you get qualified immunity if you do it. And I think that this is in that category. So your answer to me is that there is no Second Circuit case on point or even close to on point? Oh, I think it's close. I've suggested in my brief that the Annie case, which was later followed by the Supreme Court in Wilson v. Levine, that is to say bringing in strangers to participate with police officers in conducting a search, that's a Fourth Amendment violation. And I think that at this point it was clear, by the time they left, it was clear that that woman had no right to be there. And I would point the court to, I think it's Exhibit E, but in any event, while the officers were in the house, according to them, Sergeant Wheelings handed them one piece of paper, and that piece of paper had this woman's signature on it. And that piece of paper specifically stated that she would vacate the premises not later than June 30th. Now, it didn't actually suggest that she occupied the premises, but it did specifically say that as of June 30th she would be out of the state of Connecticut and this property could be conveyed back to the landlord. So at that, it was clear, and now we're well into July, that she had no right whatsoever by her own contract to be there. Thank you, Mr. Wheeling. You've reserved some time. Thank you. May it please the Court. Scott Ouellette for the defendant, Derby Police Officers. The facts of this case are extraordinary to say the least. That's at Joint Appendix Page 122. That's the first line of the plaintiff's objection to our motion for summary judgment. And in that context, all the actions of the officers has to be viewed under these extraordinary circumstances or unusual circumstances. The issue is simply whether or not Myra Wheelings had authority to consent to the officers to come in. It's clear that she did. At the very least, as the district court found, she had apparent authority and that the officers were reasonable in their assumption that she did. Doesn't sound like she had actual authority. So your best argument is apparent authority? Our best argument is apparent authority. There is, if you look at the factors that Judge Walker talked about in the Moore case on actual authority, besides the Seventh Circuit of the United States v. Grove, there's ten factors that they discussed. And it doesn't really say whether it's a balancing test or not, but arguably six of those factors applauded this case when the officers showed up. She had a key. She said she lived there. She said she had clothes there. She said she had possessions there. Her son lived there. That's the reason why she was down in South Carolina, that they were moving him down there. So arguably, those factors do apply. But you're right. Apparent authority is... I know a lot of thieves who can list all those things, too, and get into my home, but it's apparent authority. Correct. Apparent authority. What was the assistance or what did she say to the police when she called about the assistance that she required? The police report, which is page 22, says that she called saying that she just came back from South Carolina. It was the 911 call. A 911 call, and that her husband moved somebody into the house and she wanted an escort into the property so that there would be no problems or troubles. There was no allegation of domestic violence or anything like that, but it was a call to escort her into a premises. It's no different, really, than calling 911 to say, I think someone is in my house. Can you come escort me in there? The facts of Rodriguez are virtually similar here, minus the domestic violence aspect of it. Ms. Wheeling called the police herself. She didn't lie who she was. She admitted any mention of a divorce, but they wouldn't have known. No, the police wouldn't have known, and when they went inside, Mr. Wheeling said that they were divorced. Myra Wheeling was saying that they weren't. The 45 minutes that they were in there wasn't just reasonable. It was actually good policing. They were trying to understand what was going on during this situation. Did the husband at any time request them to stop her from destroying property or doing anything of that sort? The plaintiff alleges that and stated that in his deposition. The officers in the report say that everybody was civil. To think that a woman, in this weird scenario that the police officers show up at, a woman is throwing around things and breaking things, that the officers are just going to turn and walk away, is kind of extremely unlikely. Describe this scene to us again. So they arrive at the premises. Just describe this. What did the police know at this time? The police knew that this woman called 911 asking for an escort into her property because her husband moved somebody into their house. They arrived. Ms. Wheeling, Myra Wheeling was there with a key. Reiterate the same thing to the officers. She didn't get the key at the home. She had the key when they showed up. It's not like the officers didn't view her going under a rock and pulling it out or anything like that. She had the key. Go ahead with the chronology. They walk in. They call to Mr. Wheeling saying there's a report that your wife says that you moved somebody in. He comes to the top of the stairs. He says, Myra, according to him, Myra, what are you doing here? And the officers say, your wife says this. He says, that's not my wife. We were divorced years ago. Myra says, no, we're still married. The officers ask Mr. Wheeling to show some divorce papers. He doesn't have any. He tells the officers to look it up on the computer, even though allegedly it was down in South Carolina. Mr. Wheeling shows the officers this agreement that Attorney Williams was talking about, which is located at 86 in the record, which is entitled a financial agreement. But essentially it's not worded very well. It's not like a legal document, like an attorney drafted it. But it essentially says that Myra was living there with her son. She went down to South Carolina. And Mr. Wheeling was going to vacate the property on the 1st of July and move to South Carolina. And what did the police, so they're in the house. What did she want? Or what did the police believe they had to do? Or what did they do? They really didn't do anything. Once they're in there, just evaluate the situation and determine, as it says in the report, that this is a civil matter. It's a family matter. And although this is down the road, they did go through that process in a sense that Myra got a restraining order against Mr. Wheeling. No, no. I just want to know what happened that night. So they're just there trying to, according to the police report, Myra showed them that she had clothes in the attic and other possessions in the attic. They separate, Attorney Williams talked about separating the parties. But in domestic situations, which essentially this is, that's common practice. That you separate the parties to get each person's version of events. What happens then? Thereafter, they say, the officers maintain that everybody was civil. They leave the premises and say it's a civil matter, you have to deal with it through the court. After 45 minutes, they're gone. They don't linger around the front of the house, they're gone. And the complainant, the woman who called them, where is she? She was left in the house. The police didn't force anybody to stay anywhere or anything like that, but the police left. They said, call us if there's any issue. There was no call. That's the whole episode. And the alleged violation was the initial entry and not leaving soon enough. There's no violation associated with letting her stay in the home. There's no alleged violation. Is there any allegation of a search that took place? An actual search in the criminal context? The search is breaching the front door. Just going into the house. There was no search in the terms that you all are used to. A Fourth Amendment violation is just by entering and then not leaving, staying too long, even if they had initial authority. Correct. Which, again, goes to the context with the qualified governmental aspect of it. All of the cases that we cite here and we're citing deal with warrants, finding contraband, etc. This was a call for assistance. The complainant didn't ask for the police to do anything in particular inside the house? No. Just to go in in order to be with her when she went in. Wanted an escort so there'd be no trouble. Correct. And so that was to anticipate the fact that there might be an issue because there was another woman in the house. Correct. Correct. You argue that they're entitled to qualified immunity because there's no case law on this issue. Correct. First of all, remember this is a summary judgment motion, so we have to take the facts in the light most favorable. Well, I think your adversary just said that we agree with the entire description, all the facts. Actually, in Mr. Wheeling's, Sergeant Wheeling's favor, there's still no case law, at least with respect to the second part of that lingering around. If I may be permitted to pick up where I left off when I had to sit down at the end of my seven minutes. At the end of your 11 minutes. Go ahead. The complaint explicitly alleged in paragraph 13 that the defendants refused to listen to the plaintiffs and ordered them to permit Myra Wheeling's to move into the premises or they would be arrested. Now, the evidence that was presented was that when the officers left, they said to Sergeant and Mrs. Wheeling's, the lady stayed. We are not going to order her to leave. Now, they said that at a time when they had observed her destroying property, heard her verbally assaulting Mrs. Wheeling's and her two children, thus committing crimes in their presence. And knowing that Mrs. Wheeling's had signed a contractual agreement to move out of the premises, not later than the 30th or to move out of the state of Connecticut, for that matter, not later than the 30th of June, so that she clearly had no right to be in there at that time. And yet, knowing that, they not only left, they ordered Sergeant Wheeling's to allow her to remain. And when they then heard the sound of breaking... Are you claiming that she was some sort of a government agent at that point? I can't hear you. I'm saying that she is in the same position as the interloper in the A.N.E. case and in the Levine case, that the police had brought into the private property with them. And therefore, the police are responsible for not just allowing her to remain, but forbidding him to tell her to get out. Indeed, when he emerged on the front porch and said, officers, she's destroying my property, please do something, one of the defendants with his hand on his firearm said, get back into the house or you will be arrested. Now, where's the qualified immunity for that? And that certainly was contained in this complaint. And if at no other place at that point there surely was a Fourth Amendment violation that we're entitled to have remedy. Thanks very much. We'll reserve the decision. We're adjourned.